**STATE OF MINNESOTA, DEPART-MENT OF JOBS AND TRAINING, Appellees,**

v.

**MERIT SYSTEMS PROTECTION BOARD, Appellant.**

No. 87–5346.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 8, 1988.

Decided May 17, 1989.

Martha B. Schneider, Washington, D.C., for appellant.

Rebecca H. Hamblin, St. Paul, Minn., for appellees.

Before LAY, Chief Judge, HEANEY,* and ROSS, Senior Circuit Judges, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, en banc.

ROSS, Senior Circuit Judge.

This en banc submission follows an opinion of a panel of this court reported as

* The HONORABLE GERALD W. HEANEY assumed senior status on January 1, 1989.

*State of Minnesota v. Merit Systems Protection Board*, 858 F.2d 433 (8th Cir.1988). The appeal results from the district court's determination that the Merit Systems Protection Board (the Board) abused its discretion by ordering the removal of Thomas J. Kehoe, upon finding that Kehoe willfully violated the Hatch Political Activity Act (Hatch Act), 5 U.S.C. §§ 1501–1508, by running for partisan political office while a state employee in a federally funded program. While agreeing with the Board that Kehoe's political campaign violated the Hatch Act, the district court ruled that such violation was not willful and therefore not justification for his removal from employment. After a careful review of the record and the briefs and arguments of the parties we reverse the decision of the district court.

## BACKGROUND

In 1982, while an employee of the Minnesota Department of Economic Security (DES), Thomas Kehoe ran for election to the Minnesota State Legislature and lost. During his candidacy, Kehoe was on approved leave of absence from his state position of employment.

In August of 1982, the Director of DES informed the Office of the Special Counsel (OSC)[1] that Kehoe had filed to run for election as a partisan candidate. On September 3, 1982, the OSC officially warned Kehoe that it considered his political activities subject to the Hatch Act, notwithstanding the fact that he was on a state-approved leave of absence. Kehoe, however, maintained that the Hatch Act did not apply to him because of a federal district court ruling by Judge Miles Lord in *Johnson v. Cushing*, 483 F.Supp. 608 (D.Minn. 1980), which held the Hatch Act inapplicable to state employees on approved leave while pursuing political office.

On October 21, 1983, the OSC sent Kehoe a letter informing him that, due to his apparent confusion about the district court's ruling in *Johnson*, the OSC had decided to exercise leniency and not seek disciplinary action against him. However, with strong language, the OSC warned Kehoe that contrary to the language in *Johnson*, the Hatch Act does apply to an employee while on leave of absence and any future political activity proscribed by the Act would be construed as a willful violation and result in Kehoe's removal from state employment. Notwithstanding the warnings, Kehoe again ran for a seat in the Minnesota Legislature in 1984.

On June 18, 1984, the OSC advised Kehoe that his candidacy while he was still a state employee would violate the Hatch Act. To buttress its warning, the OSC supplied Kehoe with a copy of the Board's opinion in *Special Counsel v. Daniel*, 15 M.S.P.R. 636 (1983), *rev'd in part on other grounds, Special Counsel v. Purnell*, 37 M.S.P.R. 184, 201 (1988), rejecting the validity of the *Johnson* holding. On the same day, Kehoe submitted an application with the Department of Jobs and Training (DJT) (successor agency to the DES) requesting a leave during the campaign. Pursuant to Minnesota Statute § 43A.32, subd. 2(c) (1984),[2] which allows state employees to take leaves of absence to run for partisan political office, the DJT again granted Kehoe's request for leave in order to pursue a seat in the state legislature. On July 25, 1984, the Minnesota Department of Employee Relations, however, cautioned Kehoe that although the State of Minnesota was obligated under Minnesota statute to grant him leave to pursue political office, the state had no control over what actions the Board might take pursuant to the Hatch Act.

Sometime before Kehoe announced his candidacy, the DJT amended its Policy and Procedure Manual to advise employees that the Board had taken the position that the

---

1. The Office of the Special Counsel is the agency which investigates and prosecutes Hatch Act violations.

2. Minn.Stat. § 43A.32, subd. 2(c) (1984) states:
   Subd. 2. Leaves of absence for elected public officials, candidates. Except as herein provided any officer or employee in the classified service shall:
   (c) Upon request, be granted leave of absence upon becoming a candidate, or during the course of candidacy, for any elected public office.

Hatch Act applied to an employee while on a leave of absence from employment with the DJT. Moreover, the Manual advised employees that the OSC had warned that it would prosecute Hatch Act violations, which could result in removal from state employment, notwithstanding any obligation the DJT had under Minnesota state law to grant leaves of absence to pursue political office.

Despite all warnings, Kehoe took the leave of absence and unsuccessfully ran as a candidate in the 1984 election. Kehoe returned to his position with the DJT following his defeat, and on February 20, 1985, the DJT advised OSC that Kehoe had been a partisan candidate for political office in 1984. OSC filed the complaint in the instant action on November 22, 1985, charging that Kehoe had been a candidate for a partisan political office while principally employed by a state agency with federally funded programs in violation of the Hatch Act. On July 21, 1986, after a hearing on the merits, the administrative law judge (ALJ) issued a recommended decision concluding that Kehoe had willfully and knowingly violated the Hatch Act and that his removal from employment was warranted. On February 27, 1987, the Board issued an opinion and order adopting the ALJ's recommendation and ordered that Kehoe be removed from his position within thirty days of the Board's order. DJT refused to comply with the Board's order and this action ensued.

On March 30, 1987, DJT filed a petition for review of the Board's decision in the United States District Court for the District of Minnesota. On June 23, 1987, the district court issued a decision reversing the Board's ruling in part and remanding the case to the Board for the issuance of an opinion and order consistent with the court's finding that neither the DJT nor Kehoe willfully or knowingly violated the Hatch Act. This appeal followed.

DISCUSSION:

■ Under 5 U.S.C. § 1505 (1982) of the Hatch Act, the Board has plenary jurisdiction to determine whether the Hatch Act has been violated and, after a hearing, the Board is authorized to determine whether the violation warrants removal from employment. 5 U.S.C. § 1505(2). The Board's determination may be reversed only when the reviewing court determines that the Board abused its discretion, or that the decision was not in accordance with the law. *See Oklahoma v. United States Civil Service Comm'n*, 330 U.S. 127, 145–46, 67 S.Ct. 544, 554–55, 91 L.Ed. 794 (1947); 5 U.S.C. § 1508(2).

■ On cross motions for summary judgment the district court in the instant case found that the Board's decision to remove Kehoe was not in accordance with the law and accordingly reversed the Board's removal order. In reviewing this decision on appeal, this court must render an independent decision on the basis of the same administrative record and employ the same standard of review as that before the district court. *First Nat'l Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1374 (8th Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). This court must determine whether there has been an abuse of discretion without any presumption that the decision of the district court is correct. *Id.* As long as there was a reasonable basis for the Board's conclusion that removal was warranted, the district court was required to defer to that conclusion as being within the discretion of the Board. Only if the Board's conclusion had no reasonable basis would it constitute an abuse of discretion.

Applying these principles, we now turn to the arguments raised by the parties on appeal. The DJT's primary argument is that Kehoe's removal was unwarranted because Kehoe did not willfully violate the Hatch Act. Instead, the DJT argues that Kehoe reasonably relied on the district court's ruling in *Johnson v. Cushing, supra*, 483 F.Supp. 608 (D.Minn.1980), that the Hatch Act does not apply to state employees who have been granted leaves of absence.

Notwithstanding the district court's broadly stated ruling relating to the Hatch Act, *Johnson v. Cushing* was not a judicial review of a Board decision relating to the

Hatch Act but instead was a civil rights case under 42 U.S.C. § 1983. Furthermore, *Johnson* was decided as a denial of a motion for summary judgment and was not a final dispositive order.

In *Johnson*, a public employee brought a civil rights action against the Minnesota Department of Economic Security and its Commissioner claiming that the DES improperly failed to grant his request for leave of absence from his job in order to seek political office. Johnson claimed that his civil rights were violated when the DES removed him from employment when he actively campaigned for political office, notwithstanding his failure to secure an approved leave of absence. The district court, on a motion by the DES for summary judgment alleging failure to state a claim, rejected DES's argument that the Hatch Act effectively prohibited Johnson from running for any partisan political office. The court concluded without explanation that "the Hatch Act, while it applies to persons presently employed by the State Department of Economic Security, does not apply to persons who have been granted leaves of absence, or who have a statutory right to secure upon demand leaves of absence from the Department for the purpose of running for partisan political office." *Id.* at 611.

■ The *Johnson* decision is undeniably an incorrect interpretation of the Hatch Act. A review of the legislative history of the provisions of the Act makes it unmistakably clear that covered state employees are subject to the prohibitions of the Act regardless of leave status. During hearings on a proposal to extend the Hatch Act to state and local government employees, Congress specifically considered and rejected a provision which would have exempted from the Hatch Act's prohibitions those candidates who had taken a leave of absence without pay. 86 Cong.Rec. 2872–75 (1940). The legislative history of the Act further discloses that the intent of the stat-

ute was to prohibit partisan candidacy by any covered employee who had not resigned from his or her employment. *See* 86 Cong.Rec. 9447 (1940). Thus, it is clear from the statute and the legislative history that a covered state employee is prohibited from running for public office in a partisan election, even if on approved leave without pay. The holding in *Johnson* to the contrary is incorrect.[3]

■ The facts in the case before us do not support the contention that Kehoe's reliance on *Johnson* was in good faith. This is the second time that Kehoe has taken a leave of absence to run for political office. When Kehoe filed his first affidavit of partisan candidacy in 1982, the Office of the Special Counsel officially warned him that his candidacy was in violation of the Hatch Act. In response to Kehoe's statement that he relied on *Johnson*, the OSC wrote Kehoe that it would not seek disciplinary action against him for his 1982 candidacy, but officially warned him a second time that future political activity would constitute a willful violation of the Act necessitating his removal from state employment. Notwithstanding the OSC's warnings, in 1984 Kehoe again filed for partisan candidacy in the Minnesota Legislature. Kehoe's attitude is indicated by his letter to OSC informing them of his impending candidacy, "[y]ou might want to dust off your file on me; I am again thinking of becoming a partisan candidate for the Minnesota Legislature." In response, the OSC again informed Kehoe that his candidacy while remaining on the state payroll would violate the Hatch Act. The OSC enclosed a copy of the Board's opinion in *Special Counsel v. Daniel, supra*, in which it strongly rejected the *Johnson* holding as an "ipse dixit pronouncement that * * * totally disregards consistent prior administrative rulings." *Id.* at 638. Moreover, Kehoe's own employer warned him that the Board viewed his candidacy while on unpaid leave a violation of the Hatch Act which could result in his remov-

---

**3.** The district court in the instant case agreed that *Johnson v. Cushing*, 483 F.Supp. 608 (D.Minn.1980), had been wrongly decided and declined to follow its reasoning, holding instead

that a covered state employee who runs for partisan political office violates the Hatch Act, even if on approved leave without pay.

al. In fact, the DJT had revised its Policy and Procedure Manual to advise employees that, notwithstanding state law, the Board viewed political activity while on leave status as a violation of the Hatch Act and that the OSC would prosecute such violations. Kehoe acknowledged under oath that he had been warned of OSC's prosecutorial authority and that he clearly understood the risk.

Kehoe, however, chose to ignore all of these warnings and in 1984 sought political office for a second time. His reliance on *Johnson* in an effort to legitimize his indifference to the many warnings he received is insufficient to characterize his actions as having been made in good faith. If Kehoe was going to rely on *Johnson* in pursuing future political activity, he was concomitantly obligated to know the preclusive effect of the *Johnson* decision. In *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the United States Supreme Court held that the United States may not be bound by a prior decision where there is nonmutuality of parties. The Court reasoned that nonmutual collateral estoppel against the Government would "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 160, 104 S.Ct. at 572. A fortiori this reasoning applies here where the United States, although statutorily charged with adjudication of Hatch Act violations, 5 U.S.C. § 1505, was not even a party in the *Johnson* decision and had no opportunity to litigate the Hatch Act issue in the first instance. If Kehoe had made a reasonable inquiry he would have learned that *Johnson* could not bind the Merit Systems Protection Board in its adjudication of Kehoe's case.

4. There is no certainty that Kehoe will lose his job as a result of this decision. 5 U.S.C. § 1506(a) contains a provision for penalizing the state in "an amount equal to 2 years' pay at the rate the officer or employee was receiving at the time of the violation."

At oral argument to the panel the attorney for the Merit Systems Protection Board told the court that,

CONCLUSION:

In light of these circumstances, we find that it was within the Board's discretion to conclude that Kehoe willfully and knowingly violated the Hatch Act by campaigning for political office while a state employee and that his dismissal was, therefore, warranted. Kehoe's reliance on *Johnson* and the disregard paid to the OSC's warnings can reasonably be characterized as a knowing assumption of the risk that the OSC would file charges against him for violating the Hatch Act.

We conclude that the Board properly exercised its discretion when it ordered the removal of Thomas J. Kehoe from state employment upon finding that he knowingly violated the Hatch Act when he became a candidate in a partisan election.[4] We accordingly reverse the district court's determination to the contrary and remand for further proceedings consistent with this opinion.

ARNOLD, Circuit Judge, joined by LAY, Chief Judge, HEANEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge, dissenting.

Is it willful disobedience of the law to rely on a reported opinion of a United States District Court, merely because an administrative agency thinks the Court was wrong? This Court today answers that question in the affirmative. I respectfully dissent.

There is little to add to my opinion dissenting from the decision of the panel. *State of Minnesota, Department of Jobs and Training v. Merit Systems Protection Board*, 858 F.2d 433, 437 (8th Cir.1988). I am willing to assume for present purposes that *Johnson v. Cushing*, 483 F.Supp. 608 (D.Minn.1980), the opinion on which Mr.

There is no obligation for the state to lose both the employee and the money. Now, first, there has been no determination by the Board that the state will lose the money. That issue has not been resolved by the Board and would have to be considered. It is good Board law and prior Civil Service Commission law as well that a state always has the option of keeping the employee on the rolls and taking the monetary penalty.

Kehoe relied when he ran for office while on leave of absence, was incorrectly decided. I assume, in other words, that the Merit Systems Protection Board is correct in insisting that the Hatch Act applies to employees on leave of absence, and the District Court in the present case, and this Court, both of which agree with the Board on that point, are also correct. But that is not the question before us. We must decide whether the Board acted reasonably in labeling Mr. Kehoe's reliance on *Johnson* a willful violation of law. With all deference to the Board and to this Court, I am at a loss to understand how anyone can take that position.

Perhaps the case would be clarified if we remind ourselves that the focus is not on the legal question—what does the Hatch Act mean?—but rather on a moral question —what was Mr. Kehoe's state of mind when he decided to obtain a leave of absence to run for the Legislature? He knew that the Board disagreed with *Johnson*, and disagreed strongly. But surely a court decision on an issue of statutory interpretation must have at least equal dignity with the view of an administrative agency. (Indeed, since courts review agencies, and not the other way around, one might think (and I do think) that courts' decisions have greater dignity.)

So what was there about this particular court decision that made reliance on it unreasonable? The Court says *Johnson* was an action under 42 U.S.C. § 1983, not an action for review of a Board decision. It also was an opinion denying a motion for summary judgment and not, as the Court puts it, "a final dispositive order." *Ante*, at 183. But why do these circumstances matter? The answer is that they do not. The basis of the *Johnson* court's jurisdiction is not relevant. It undeniably had jurisdiction, the Hatch Act question was squarely raised by the motion for summary judgment filed by the defendant, the same state agency involved in the present case, and the Court decided the point without equivocation. As to the finality of the order, of course it was nonfinal. Orders de-

nying motions for summary judgment do not end cases. Would the matter come out differently if the *Johnson* court had been *granting* the plaintiff's motion for summary judgment, instead of *denying* the defendant's motion? Either way, an authoritative ruling on the meaning of the Hatch Act is made. The Court today also says that the *Johnson* court's ruling was "without explanation," *ante* at 183. This is true, but so what? Are we to hold that the quality of a written opinion governs the extent to which members of the public may rely on decisions of federal courts?

So I come back to the starting point. Mr. Kehoe had before him a federal court opinion in his favor, not contradicted by the opinion of any other federal court in the country, and an administrative-agency opinion, or series of opinions, against him. He had the permission of his employer, which evidently considered itself bound by *Johnson*, even though it knew the Merit Systems Protection Board disagreed with *Johnson*. Wherein was his behavior willful? He certainly willfully violated the view of the Board, as the letter quoted by the Court, *ante* at 183, shows. But the Board is not the law, and a deliberate defiance of the Board's opinion is not the same thing as a willful violation of the Hatch Act.

Apparently the crux of this Court's reasoning is the holding of the Supreme Court in *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), holding that the United States (and, by extension, I suppose, agencies like the Merit Systems Protection Board) is not subject to nonmutual collateral estoppel. In the present context, *Mendoza* means this: the fact that the *Johnson* court rejected the Board's view of the Hatch Act does not mean that the Board is estopped to assert its view in this case, where a different state employee is the opposing party. But no one has ever asserted such an estoppel. If Mr. Kehoe were claiming that *Johnson* was correctly decided, and if the Board had been a party to *Johnson*,[1] and if Mr. Kehoe

1. The Court quite rightly points out that the

Board was not a party in *Johnson*. This proves

were arguing that the *Johnson* opinion precluded the Board from asserting its view of the Hatch Act in this case, *Mendoza* would stand squarely against him, and he would lose his collateral-estoppel argument hands down. But he isn't claiming any of those things. He is willing to assume, for present purposes, that the Board is right on the law. His point is simply that in 1984 it was reasonable (or non-willful, which may be an easier standard to meet) for him to think otherwise. So *Mendoza* has nothing to do with this case.

Because Mr. Kehoe relied on a federal court rather than an administrative agency, and because this Court holds, after the fact, that the agency is right on the law, Mr. Kehoe will lose his job as a willful violator of the law.[2] I think this is unjust, and I dissent. I would affirm the judgment of the District Court.

only that *Johnson* has no preclusive effect on the question of the interpretation of the Hatch Act—a point I cheerfully concede. The Court also says the Board "had no opportunity to litigate the Hatch Act issue in [*Johnson*]," *ante* at 184. If it matters, this is not necessarily true. I know of no reason why the Board could not have intervened in *Johnson*.

2. There may be some uncertainty about this sanction, but, as the Court says, *ante* at 182, the Board ordered Kehoe removed from his position, and this Court is now reinstating the Board's order. If, as the Court suggests, *ante* at 184 n. 4, the Board decides to impose a monetary penalty on the state, instead of requiring that it fire Kehoe, a result will occur which is, if anything, even more unfair than a sanction resting solely on the employee. As noted in text, the Merit Systems Protection Board is certainly not bound by *Johnson*, but the state agency which employs Mr. Kehoe, just as certainly, is bound by *Johnson*. It was a party to that case, and it was told by the United States District Court to do exactly what this Court is now saying may subject it to a money penalty.