**Robert D. ALEXANDER, Plaintiff–Appellant,**

v.

**MERIT SYSTEMS PROTECTION BOARD, Defendant–Appellee.**

No. 97–2131.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 29, 1998.

Decided Jan. 21, 1999.

---

George V. Warren (argued and briefed), Lansing, MI, for Plaintiff–Appellant.

Eric D. Flores (argued and briefed), U.S. Merit Systems Protection Board, Washington, DC, Michael H. Dettmer, U.S.Atty., Office of U.S.Atty. for Western District of Michigan, Grand Rapids, MI, Janet Reno, US Atty. General, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Defendant–Appellee.

Before: GUY, CLAY, and GILMAN, Circuit Judges.

## OPINION

RALPH B. GUY, JR., Circuit Judge.

Plaintiff, Robert Alexander, appeals the district court's decision affirming the order of the Merit Systems Protection Board (Board) that he be removed from his employment with the State of Michigan for violation of the Hatch Political Activity Act (Hatch Act), 5 U.S.C. § 1502(a)(3). The Board found plaintiff violated the Hatch Act by being a candidate in a partisan election while principally employed with the Michigan Department of Social Services (DSS) in the Medicaid Program.[1] On appeal, Alexander argues that the district court failed to properly determine whether the Board's decision was in accordance with law and not an abuse of discretion. Alexander also argues that his due process rights were violated because the Hatch Act does not adequately define who is covered, does not exempt employees who take an unpaid leave of absence, and does not define the penalty of removal.[2] Finally, Alexander claims he was denied equal protection because the Hatch Act imposes more severe penalties on state employees than federal employees. After careful review of the entire record and the arguments on appeal, we affirm.

---

1. In his complaint for review of the Board's decision, plaintiff named both the Board and the Office of Special Counsel (OSC) as defendants. The district court granted the OSC's motion to dismiss and the OSC was voluntarily dismissed from this appeal.

2. Although Alexander invokes due process protections, he has not made any attempt to demonstrate a distinct constitutional due process claim. As a result, we have treated these claims on appeal as challenging whether the Board's decision is in accordance with the law.

## I.

Alexander was employed as a Department Analyst with the Michigan DSS, first in the Energy Services Division and then in the Medical Services Administration. The parties stipulated that (1) the DSS is an executive agency of the State of Michigan, (2) when plaintiff declared his candidacy in May 1992 he was acting as a project officer for the Medicaid Program, and (3) the Medicaid Program is 50 percent funded by reimbursement from the United States Department of Health and Human Services.

In March 1992, Alexander learned that the democratic State Representative for the 53rd District would not run for re-election and considered becoming a candidate. Plaintiff had prior experience with partisan politics and was familiar with the Hatch Act. He knew that the Act prohibited covered state employees from becoming candidates in partisan elections, but questioned whether he was a covered employee. The Act defines a covered employee as an individual employed by a state or local agency "whose principal employment is in connection with an activity which is financed in whole or part by *loans* or *grants* made by the United States or a Federal agency," 5 U.S.C. § 1501(4) (emphasis added). Federal medicaid funding was universally referred to as a "reimbursement" within the DSS. Alexander reasoned that if the reimbursements were not loans or grants, he would not be a covered employee and, therefore, the Hatch Act would not prohibit him from participating in the election.

Although Alexander inquired from a number of sources whether a state employee whose position is partially funded by federal reimbursements was covered by the Hatch Act, he was not satisfied with any of the answers he received. Plaintiff's supervisor, Ed Kemp, thought Alexander was covered by the Act and suggested he call Human Resources. On April 9, 1992, Alexander contacted Paul Servais of the DSS's Office of Human Resources, who told him he was covered by the Hatch Act and could not run in a partisan election. Alexander also called the Michigan Department of Civil Service for information on both the Hatch Act and the state civil service requirement that he take a 60–day unpaid leave of absence to run for office. He received a copy of a discussion paper addressing the Hatch Act, which did not mention reimbursements, but commented that the Act had 3,000 confusing contradictory rules.

In late April 1992, plaintiff again specifically asked Servais whether a "reimbursed" employee was covered by the Hatch Act. Although Servais said he was covered, Alexander was not satisfied by this response because Servais could not provide a written explanation verifying his opinion. With that, Servais suggested that Alexander could call Heidi Weintraub, who was his contact at the Office of Special Counsel (OSC) in Washington, D.C. Although he did not have any prior contact with Servais in particular, Alexander distrusted Human Resources generally because he had successfully grieved an earlier demotion on the grounds that Human Resources had failed to follow the proper procedures.

Alexander called Weintraub, not knowing that the OSC prosecuted violations of the Hatch Act,[3] and identified himself as an employee of Michigan's Medicaid Program. Weintraub responded that he was covered by the Act and would have to resign to run in the primary. When Alexander questioned whether medicaid "reimbursements" were "loans or grants" for purposes of the Act, Weintraub responded that he was covered and that was all he needed to know. Alexander called Weintraub again several days later (1) to request a citation to verify that medicaid employees are covered by the Act, and (2) to ask if he would still be covered if he took an unpaid leave of absence. Weintraub unequivocally answered that he was covered by the Act, that state-mandated leave policies were irrelevant to the Act, and that she did not have to provide him with any citations to verify this information. Weintraub nonetheless offered to send him a booklet that would answer his questions.

3. The OSC is responsible for not only giving advice concerning the Hatch Act, but also for investigating and prosecuting alleged violations of the Act.

Alexander received a booklet entitled "Political Activity and the State and Local Employee." Alexander did not find an answer to his question, although he admitted he did not read all of it. An "important note" on the first page of the booklet warned that ignorance of the law does not excuse a violation of the Hatch Act and explained that an advisory opinion could be requested from the OSC. While the booklet listed "public health" as a program that frequently receives federal funds, it did not specifically list medicaid.[4] Despite the information provided in the booklet concerning the financial penalties that may be imposed on a state employer under the Hatch Act, Alexander assumed DSS would only be penalized in an amount equal to twice his salary for the *one* month before his state-mandated leave of absence began. As a result, he did not believe DSS would remove him from his position if he was found to have violated the Act. Relying on the failure of Servais and Weintraub to verify that he was a covered employee, Alexander concluded that it was uncertain whether the Hatch Act applied to him and decided to "run and take a chance on an unclear situation."

On May 11, 1992, Alexander filed his nominating petition to become a candidate. The next day, Alexander called John Sorbet, a DSS federal funding analyst who had been on vacation, to ask about medicaid funding. Sorbet explained that federal medicaid funding is received in the form of a "quarterly grant award." While this information, received from someone outside Human Resources, indicated that medicaid funding was by grant and, therefore, meant he was a covered employee, Alexander disregarded this information as well. About a week later, Alexander told Servais that he had decided to run, explained that he disagreed with Weintraub's opinion, and indicated that the issue might end up in court. Within a few weeks, Servais wrote to the OSC to advise them that Alexander intended to be a candidate in the partisan primary election to be held on August 4, 1992.

On July 23, 1992, OSC investigator Butch Perkins met with Alexander for an hour,

explained the Hatch Act to him, and conducted an interview. Alexander complains that Perkins did not offer to "drop" the investigation if he withdrew from the campaign and implies that he would have taken such an offer at that point. Alexander lost the primary a few weeks later and returned to work.

In July 1993, the OSC filed a complaint with the Merit Systems Protection Board alleging that Alexander's candidacy violated the Hatch Act. The Board assigned the case to an administrative law judge (ALJ), who permitted discovery, held hearings, and issued a 72-page recommended decision in July 1995. The ALJ recommended the Board find that Alexander had violated the Hatch Act as alleged, but that the violation did not warrant removal from his position. The ALJ concluded that from May 12 through August 4, 1992, Alexander was a covered employee and had campaigned for partisan political office. While the ALJ found Alexander had acted reasonably and responsibly in trying to determine his coverage under the Act prior to May 12, he nonetheless concluded as follows:

His continuing to campaign after learning from an independent DSS source that his office was funded by so-called quarterly *grant* awards constituted a knowing assumption of risk that a reasonably prudent person would not have taken and thereby established a knowing and willfull violation of the Hatch Act. The offense of campaigning for partisan political [office] is a serious offense. Nevertheless, the actions of the Petitioner significantly contributed to Respondent's assumption of the risk and accordingly such assumption ought not be a basis for Respondent's removal.

(Emphasis in original). The OSC filed exceptions to the recommendation, to which Alexander responded.

The Board's final decision and order, issued October 6, 1996, adopted in part and reversed in part the ALJ's recommended decision and found that Alexander's "violation [of the Hatch Act] was of such scope and effect as to warrant removal from his posi-

---

4. Title 42 of the Code of Federal Regulations, containing the medicaid regulations with which Alexander worked so extensively, is entitled *"Public Health."*

tion." *Special Counsel v. Alexander,* 71 M.S.P.R. 636, 640 (1996). The Board accordingly ordered that the DSS could chose to either remove Alexander from his position, or forfeit receipt of federal funds in an amount equal to two years of his pay. The Board also ordered that federal funds equal to two years' salary would be withheld if Alexander were hired by a state or local agency in the State of Michigan within 18 months after his removal. DSS promptly terminated Alexander's employment.

Alexander appealed to the district court and obtained a stay of the Board's decision. As a result, DSS changed his termination to an indefinite suspension without pay. The district court affirmed the decision of the Board for the reasons set forth in its opinion of September 30, 1997. Alexander filed an appeal to this court and, in January 1998 his employment with DSS was finally terminated.

## II.

■ The Merit System Protection Board has plenary jurisdiction under 5 U.S.C. § 1505 to determine after a hearing whether a state or local employee has violated the Hatch Act, and "whether the violation warrants the removal of the officer or employee from his office or employment[.]" "The Board's determination may be reversed only when the reviewing court determines that the Board abused its discretion, or that the decision was not in accordance with the law." *Minnesota Dep't of Jobs and Training v. Merit Sys. Protection Bd.,* 875 F.2d 179, 182 (8th Cir.1989) *(en banc )* (citations omitted).

■ The Hatch Act prohibits a covered state employee from running as a candidate in a partisan election. *See Williams v. Merit Sys. Protection Bd.,* 55 F.3d 917, 920 (4th Cir.1995) (partisan candidacy by a covered employee is a "per se violation of the Hatch Act"); 5 U.S.C. § 1502(a)(3); 5 C.F.R. § 151.101(f) (1998). Once it is shown that a state employee violated the Act, the only alternatives are removal or no penalty. *See Minnesota,* 875 F.2d at 182. The question of whether removal is warranted is a matter of administrative discretion. *See Oklahoma v. United States Civil Serv. Comm'n,* 330 U.S.

127, 146, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *Jarvis v. United States Civil Serv. Comm'n,* 382 F.2d 339, 342–43 (6th Cir.1967); 5 U.S.C. § 1508.

■ In reviewing the district court's order, we must make an independent decision from the administrative record employing the same standard of review as the district court. *See Minnesota,* 875 F.2d at 182. "As long as there was a reasonable basis for the Board's conclusion that removal was warranted, the district court was required to defer to that conclusion as being within the discretion of the Board. Only if the Board's conclusion had no reasonable basis would it constitute an abuse of discretion." *Id.*

Alexander does not directly contest the Board's factual finding that he was a covered employee under the Hatch Act or that he violated the Act by becoming a candidate in a partisan election. In fact, he asks that we adopt the ALJ's recommendation. Alexander challenges the district court's decision, raises several arguments concerning the application of the Hatch Act, and argues that the Board abused its discretion in ordering that he be removed from employment with the State of Michigan.

### A. *Olenhouse* Motion

■ Alexander challenges the district court's decision on the grounds that it was improper to decide the case from the Board's motion to affirm, relying upon *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579–80 (10th Cir.1994). In *Olenhouse,* the Tenth Circuit disallowed the use of summary judgment procedures in appeals from agency decisions under the Administrative Procedures Act, even when framed as a motion to affirm, because it invites improper consideration of evidence outside the administrative record and reliance upon post hoc rationalizations for the agency's action. While we have not previously discussed *Olenhouse,* we need not decide whether to follow the Tenth Circuit's lead in this regard. We are certainly similarly concerned that district courts apply the proper standard of review and avoid consideration of evidence outside the administrative record. In this case, we find no error.

The Board filed a motion to affirm that did not rely upon summary judgment standards or offer new evidence, and the district court recognized and applied the appropriate standard for reviewing the Board's final decision and order. This is all that was required of the district court. *See Baca v. King,* 92 F.3d 1031, 1034 n. 1 (10th Cir.1996) (no error where proper standard of review applied to administrative action); *Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 214 (5th Cir. 1996) (*Olenhouse* distinguishable and inapplicable where agency relies solely upon administrative record). Besides, even in *Olenhouse,* the Tenth Circuit chose to conduct the appropriate review itself, rather than remanding the case for further proceedings. *See Olenhouse,* 42 F.3d at 1580.[5]

### B. "Loans or Grants"

■ Alexander argues that the Hatch Act fails to adequately define which state employees are covered. The Act provides in pertinent part that:

"State or local officer or employee" means an individual employed by a State or local agency whose principal employment is in connection with an activity which is financed in whole or part by loans or grants made by the United States or a Federal agency....

5 U.S.C. § 1501(4). Alexander claims that the Act fails to define "loans or grants" and, as a result, he was unsure whether the federal funds that financed Michigan's Medicaid Program came within the definition since they were universally referred to as "reimbursements." There can be no question, however, that Alexander was a state employee covered by the Hatch Act because he was principally employed in connection with the Medicaid Program, which is 50 percent financed by grants from a federal agency.

In fact, Alexander conceded before the ALJ that the Medicaid Program was funded by federal grants. Alexander testified that he had recently been told by a federal Health Care Financing Administration (HCFA) employee that the first word of the Social Security Act provisions relating to medicaid is "grants." *See* 42 U.S.C., Subchapter XIX— Grants to States for Medical Assistance Programs. Likewise, the federal regulations under 42 C.F.R., Subchapter C, Part 430— Grants to States for Medical Assistance Programs, set forth the following program description in the first section: "Title XIX of the Social Security Act, enacted in 1965, authorizes *Federal grants* to States for medical assistance...." 42 C.F.R. § 430.0 (1998) (emphasis added). Also, not much further into the regulations, a section entitled "Grants procedures" begins: "Once HCFA has approved a State [medicaid] plan, it makes *quarterly grant awards* to the State to cover the Federal share of expenditures for services, training, and administration." 42 C.F.R. § 430.30(a)(1) (1998) (emphasis added).

■ Alexander seems to argue that he did not have reason to *know* he was a covered employee, which would be relevant to the question of whether removal was warranted. Alexander testified that he felt uncertain whether he was a covered state employee and decided to "take a chance on an unclear situation." While it is true Alexander made an effort to find out if he was covered by the Act, he proceeded to completely disregard the uncontradicted and unequivocal warnings that he was a covered employee prohibited from running for state representative. In fact, no one told Alexander that he was not covered by the Hatch Act. Moreover, Alexander learned from Sorbet the day after he filed his nominating petition that the federal

5. Alexander argues that the district court reiterated errors and misstatements by the Board, even though he had identified "102 errors, misstatements, and omissions" in the Board's decision. After reviewing the claimed errors, we note that plaintiff's exceptions to the Board's decision do not represent factual errors, but largely reflect his disagreement with the conclusions of the Board, his objections to the references to medicaid being a "federally-funded" program, and his own argumentative characterization of the record. Alexander also argues that the district court's discussion of his equal protection claim misapprehends the impact of the Board's decision upon him. It is clear that his quarrel in this regard is with the court's legal conclusions. We have reviewed the ALJ's recommendation, the Board's decision, and the district court's opinion. Although we do not find material errors, misstatements or omissions in the facts, we nonetheless make an independent review of the administrative record.

portion of medicaid was paid by quarterly *grant* awards. Finally, despite his professed familiarity with a large portion of the federal medicaid regulations and his practice of citing to regulations in connection with his work, Alexander did not examine the regulations himself.[6]

## C. Civil Service Leave of Absence

■ Alexander claims that the Board should be required to recognize his mandatory unpaid leave of absence as an exception to coverage under the Hatch Act. Acknowledging that the court in *Minnesota Department of Jobs and Training v. Merit Systems Protection Board,* 875 F.2d 179, 183 (8th Cir.1989), specifically held that the Hatch Act applies without regard for an employee's leave status, Alexander argues that the case was wrongly decided. We disagree. The Eighth Circuit explained that

> the legislative history of the provisions of the Act makes it unmistakably clear that covered state employees are subject to the prohibitions of the Act regardless of leave status. During hearings on a proposal to extend the Hatch Act to state and local government employees, Congress specifically considered and rejected a provision which would have exempted from the Hatch Act's prohibitions those candidates who had taken a leave of absence without pay. 86 Cong.Rec. 2872–75 (1940). The legislative history of the Act further discloses that the intent of the statute was to prohibit partisan candidacy by any covered employee who had not resigned from his or her employment. *See* 86 Cong.Rec. 9447 (1940).

*Id.*

Further, Alexander's reliance upon the dissent in *Minnesota* is misplaced. Thomas

Kehoe, the plaintiff in that case, was aware of and relied upon the federal district court decision in *Johnson v. Cushing,* 483 F.Supp. 608 (D.Minn.1980), an action brought under 42 U.S.C. § 1983 in which the court held the Hatch Act did not apply to a state employee on leave of absence. Alexander fails to recognize that the dissenters in *Minnesota* agreed with the majority that *Johnson* was wrongly decided, and only took issue with the conclusion that Kehoe could not have reasonably relied upon the *Johnson* decision. Of course, Alexander has a much weaker argument than Kehoe, because Alexander did not claim to have relied upon *Johnson,* or any federal district court decision for his claim that he was not covered by the Hatch Act. In fact, no one ever told Alexander that he could run for office without violating the Hatch Act.[7]

## D. Removal Penalty

■ Plaintiff makes the novel argument that the penalty of removal for state employees is vague and should be interpreted to be the same as a suspension. This argument is without merit. The penalty provision in 5 U.S.C. § 1506(a) clearly gives the employer the choice of removing the employee in question "from his office or employment," or forfeiting federal funds equal to two years' pay at the rate or amount the employee was receiving at the time of the violation. Further, for 18 months *after his removal* from employment, federal funds also will be forfeited if the employee is appointed to an office or employment with a state or local agency within the same state. *Id.* While Alexander is correct that the threat of a financial penalty is lifted after 18 months,

---

6. Alexander continues to argue that federal reimbursements are not "loans or grants" for purposes of the Hatch Act. We need not discuss this issue, however, because Alexander concedes he was specifically told that medicaid is funded by "quarterly grant awards."

7. Alexander cites two cases to support his contention that the Hatch Act does not preclude political activity while on leave of absence. *See Biller v. Merit Sys. Protection Bd.,* 863 F.2d 1079 (2nd Cir.1988); *Blaylock v. Merit Sys. Protection Bd.,* 851 F.2d 1348 (11th Cir.1988). In *Biller*

and *Blaylock,* the plaintiffs were federal employees who took a leave of absence to work for a union. They wrote articles that criticized President Reagan and supported the candidacy of Walter Mondale. In both cases, the courts found that the activity did not violate the Hatch Act because the plaintiffs did not take active part in a political campaign. Finding no violation of the Act, the First Amendment constitutional claims were not addressed. Neither case, however, was decided on the grounds that these employees were on leave of absence.

this only means that after a separation of 18 months a state or local agency could hire him without forfeiting federal funds. This is clearly not the equivalent of an 18–month suspension without pay. Alexander's contention is further undermined by the fact that Congress included suspension without pay as a penalty for federal employees who violate the Act, but whose violations do not warrant removal. *See* 5 U.S.C. § 7326.

## E. Abuse of Discretion

■■■■ Alexander maintains that the Board abused its discretion in finding that removal was warranted for his violation of the Hatch Act and urges that we adopt the ALJ's recommended decision. The question of whether removal is warranted is a matter of administrative discretion. *See Oklahoma v. United States Civil Serv. Comm'n*, 330 U.S. 127, 146, 67 S.Ct. 544, 91 L.Ed. 794 (1947). Whether removal is appropriate depends upon the seriousness of the violation, taking into account all relevant mitigating and aggravating factors. *See Williams v. Merit Sys. Protection Bd.*, 55 F.3d 917, 922 (4th Cir.1995). Those factors include: (1) the nature of the offense and the extent of the employee's participation; (2) the employee's motive and intent; (3) whether the employee received the advice of counsel regarding the activities at issue; (4) whether the employee ceased the activities at issue; (5) the employee's past employment record; and (6) the political coloring of the employee's activities. *See Special Counsel v. Purnell*, 37 M.S.P.R. 184, 200 (1988), *aff'd sub nom. Fela v. Merit Sys. Protection Bd.*, 730 F.Supp. 779 (N.D.Ohio 1989). We must determine from a review of the administrative record whether there was a reasonable basis for the Board's decision that removal was warranted. *See Minnesota*, 875 F.2d at 182. We find that there was more than a reasonable basis for the Board to find that Alexander's violation of the Hatch Act warranted his removal.

■■■ As the Board noted, candidacy in a partisan political election is a substantial and conspicuous violation of the Hatch Act, which has clear political coloring. *See Alexander*, 71 M.S.P.R. at 647–48. *See also Special Counsel v. Brondyk*, 42 M.S.P.R. 333, 337 (1989). Alexander was familiar with the Act and knew that if he was a covered state employee, he would be prohibited from running in the primary. Alexander disregarded the repeated warnings from Kemp, Servais, and Weintraub, that he was covered by the Hatch Act and was never advised to the contrary. Instead, Alexander relied on the distinction he saw between reimbursements and grants without determining whether such a distinction was supported by the medicaid statute and regulations. Unsatisfied by Weintraub's answers and refusal to provide him with verification, Alexander concluded that the question of whether he was a covered employee was "uncertain" and decided to take a chance that he would be in violation of the Act. Further, Alexander admitted that he was told the day after he filed his nominating petition that medicaid is funded by federal grant awards, but continued to run. We conclude the record more than supports a finding that Alexander willfully violated the Act.

■■■■ The Board also had a reasonable basis for rejecting the ALJ's conclusions concerning the reasonableness of Alexander's decision to disregard the warnings of Weintraub and Servais. We agree with the Board that Alexander understood but disagreed with Weintraub's advice and chose to disregard it. Nor was Alexander's conduct justified by the failure of Weintraub to provide him with a citation to prove he was covered or explain to his satisfaction why she believed he was covered by the Act. Likewise, we agree with the Board's statement that "we cannot sanction a public employee's disregard of the advice of his agency's personnel office and his superior merely because he had successfully challenged a personnel action in the past." *Alexander*, 71 M.S.P.R. at 649.

Thus, we find the Board's conclusion that Alexander violated the Hatch Act was in accordance with the law, and the determination that his violation warranted removal was not an abuse of discretion.

## III.

■ Alexander argues that his constitutional right to equal protection was violated because the Hatch Act imposes more severe penalties on state employees than federal employees both in the penalty provisions set out in the Hatch Act and as applied by the Merit Systems Protection Board. That there are differences in the treatment of federal and state employees, however, does not in and of itself establish an equal protection violation.[8] Nor are equal protection guarantees "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). " 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think the political branch has acted.' " *Id.* at 314, 113 S.Ct. 2096 (quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (footnote omitted)).

The differences in the Hatch Act's treatment of federal and covered state or local agency employees clearly do not involve classifications, either facially or as applied, along "suspect" lines. Further, although Alexander has repeatedly raised the specter of the First Amendment in this case, the Supreme Court has never recognized a fundamental right to express one's political views by becoming a candidate for office. *See Carver v. Dennis*, 104 F.3d 847, 850–51 (6th Cir.1997); *Brazil–Breashears v. Bilandic*, 53 F.3d 789, 791 (7th Cir.1995).

■ If a classification neither involves a suspect or quasi-suspect classification, nor infringes a fundamental constitutional right, it must be upheld against an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096

(citations omitted). On rational-basis review, a classification bears a strong presumption of validity and "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, 508 U.S. at 315, 113 S.Ct. 2096 (citing *Vance*, 440 U.S. at 111, 99 S.Ct. 939). The government has "no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

Alexander correctly notes that there are differences in the penalties for Hatch Act violations committed by federal employees and those committed by covered state and local agency employees. Alexander specifically complains that the only penalty that may be imposed on a state employee under 5 U.S.C. § 1506 is removal for not less than 18 months, while the penalties for federal employees under 5 U.S.C. § 7326 include suspension without pay. Alexander argues that if an intermediate penalty, such as a suspension, had been available in his case, the Board could have imposed a lesser penalty than removal.

In the case of a covered state employee, the Board must find both that there was a violation and that the violation warrants removal before *any* penalty may be applied. *See* 5 U.S.C. § 1505. In contrast, a federal employee who violates the Act "shall be removed" except that when the Board unanimously finds that the violation does not warrant removal, the employee *still* must be suspended without pay. *See* 5 U.S.C. § 7326. Although the Hatch Act does not define when removal is warranted, the Board has applied the same factors to determine whether a violation by a state or federal employee warrants removal. *See Special Counsel v. Purnell*, 37 M.S.P.R. 184, 200 (1988) (state employee), *aff'd sub nom. Fela v. United States Merit Sys. Protection Bd.*, 730 F.Supp. 779 (N.D.Ohio 1989); *Special*

---

**8.** Plaintiff's reliance upon *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), is misplaced. While *Davis* involved a challenge to different tax treatment of federal and state retirees' retirement benefits, the challenge was not based on equal protection, but on a federal statute which preserves federal employees' immunity from discriminatory taxation. *See* 4 U.S.C. § 111.

Counsel v. Lee, 58 M.S.P.R. 81, 91 (1993) (federal employee).

In this case, since the Board found Alexander's willful violation warranted removal, the penalty would have been the same even if he had been a federal employee.[9] Moreover, even when the Board finds a state employee's violation warrants removal, his employer may still chose not to remove him if it is willing to forfeit federal funds in an amount equal to two times his annual salary at the time of the violation. See 5 U.S.C. § 1506. At the same time, a state or local agency employer simply cannot circumvent the penalties by moving the employee to another position, because the removal penalty is coupled with a 18–month debarment from employment by any agency in the state that receives federal funds. Id. Thus, the penalties which may be imposed on a state employee for violation of the Hatch Act are more severe in some situations and less severe in other situations than the penalties for federal employees.

These are not the only differences in the treatment of federal employees and covered state employees. When first enacted, the Hatch Act regulated only the activities of federal employees. It was not until the following year that Congress extended Hatch Act coverage to those state and local employees principally employed in connection with federally-funded activities. Even a cursory review of the provisions reveals significant differences in the scope of activities that are prohibited by the Hatch Act. In fact, federal employees are prohibited from engaging in a broader range of political activities than covered state employees. Compare 5 U.S.C. §§ 7323, 7324 and 7325 with 5 U.S.C. § 1502(a).

The interests of the federal government in regulating the political activities of its own employees were discussed by the Supreme Court in United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 564–67, 93 S.Ct. 2880,

37 L.Ed.2d 796 (1973). There, the Court noted that the partisan political activities of federal employees are limited in order that government operate effectively and fairly, without political influence or the appearance of political influence, and that federal employment be based on merit rather than political performance. Id. When it comes to regulating the political activities of state employees, however, the federal government does not have the same interest in promoting efficiency or public confidence in state government as a whole but, rather, has an interest in removing partisan political influence from the administration of federal funds. See Oklahoma v. Civil Serv. Comm'n, 330 U.S. 127, 142–43, 67 S.Ct. 544, 91 L.Ed. 794 (1947); Fela v. Merit Sys. Protection Bd., 730 F.Supp. 779, 780 (N.D.Ohio 1989). While the federal government, acting in its role as an employer, can directly require the removal or suspension of a federal employee, the power of Congress to regulate the actions of covered state and local agency employees is based on its spending power; that is, the ability to withhold federal funds. As such, Congress was required to devise a different penalty scheme for state and local agency employees. In doing so, Congress may have determined that it was necessary to threaten a sufficiently serious penalty, i.e., removal with an 18–month debarment or the payment of a significant financial penalty, in order to secure compliance with the statutory prohibitions for covered state and local agency employees. We find that these are reasonably conceivable considerations that could provide a rational basis for the different statutory penalty provisions for federal employees and covered state and local agency employees who violate the Hatch Act.

 Alexander also claims that the Hatch Act violates equal protection as applied, because the Board has imposed harsher penalties on state or local employees than federal employees for the same violations of the Act.

---

9. It was for this reason that the district court concluded Alexander did not have standing to assert an equal protection challenge. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). While we agree that Alexander could not have been

adversely affected by the omission of suspensions from the statutory penalties available for violations by covered state employees, we simply conclude that he has failed to demonstrate he was deprived of equal protection.

We disagree. First, because the question of whether a particular violation warrants removal is made on a case-by-case basis, the differences in circumstances from case-to-case provides a rational basis for differences in the outcomes. Second, the alleged disparities are not what plaintiff would have us believe. Relying on his own subjective compilation of Board decisions since 1984, Alexander asserts that while 31 of 33 state or local employees were removed, only 3 of 22 federal employees were removed for the same violations. The cases involving the 22 federal employees, however, included both non-final cases and those alleging conduct that is not prohibited for covered state employees. Of the 12 final cases involving partisan candidacy and fund-raising by federal employees (activities which state employees are also prohibited from engaging in), five were settled by agreement and seven went to decision by the Board. Of these seven cases, four employees were suspended and three were removed. The three federal employees who were removed were similarly-situated to Alexander in that they also were found to have deliberately violated the prohibition on partisan candidacy. *See Special Counsel v. Dominguez,* 55 M.S.P.R. 652 (1992) (employer cautioned against running); *Special Counsel v. Carney,* 31 M.S.P.R. 32 (1986) (warned by employer and OSC); *Special Counsel v. Johnson,* 26 M.S.P.R. 560 (1985) (warned by OSC).

Finally, to the extent that Alexander's equal protection claim may be understood to complain that the OSC selectively enforced the Hatch Act against him because he was a state employee, we agree with the district court that it is without merit. *See Futernick v. Sumpter Twp.,* 78 F.3d 1051, 1060 (6th Cir.1996) ("the choice of whom to prosecute or cite for a violation of an otherwise valid law or regulation is constitutionally troublesome only when it is blemished by the intent to harm a protected group or punish a person for the exercise of a constitutionally protected right").

**AFFIRMED.**