PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GAYLE W. FIGG, personally and as
personal representative of the estate
of Thomas Allen Figg, deceased;
ROBERT L. FIGG, III; JOHN STUART
FIGG; MARTHA FIGG WILLIAMS;
WAYNE ATTANASIO,
              *Plaintiffs-Appellees,*

v.

JOHN A. SCHROEDER, Sergeant;
MICHAEL J. ANTHONY, Sergeant,
              *Defendants-Appellants,*

and                                        No. 01-2331

THOMAS C. LAND, Individually and
in his official capacity as Sheriff's
Deputy; JOHN DOES, 1-10, consisting
of several unidentified Hanover
County Sheriff's Deputies,
individually and in their official
capacities as Sheriff's Deputies;
WINSTON R. ROBERTSON; DOUGLAS R.
HINES; V. STUART COOK,
Individually and as Sheriff, Hanover
County,
              *Defendants.*

GAYLE W. FIGG, personally and as
personal representative of the estate
of Thomas Allen Figg, deceased;
ROBERT L. FIGG, III; JOHN STUART
FIGG; MARTHA FIGG WILLIAMS;
WAYNE ATTANASIO,
                    *Plaintiffs-Appellees,*

                    v.

JOHN A. SCHROEDER, Sergeant;
MICHAEL J. ANTHONY, Sergeant,
                    *Defendants-Appellants,*

                    and                                    No. 01-2332

THOMAS C. LAND, Individually and
in his official capacity as Sheriff's
Deputy; JOHN DOES, 1-10, consisting
of several unidentified Hanover
County Sheriff's Deputies,
individually and in their official
capacities as Sheriff's Deputies;
WINSTON R. ROBERTSON; DOUGLAS R.
HINES; V. STUART COOK,
Individually and as Sheriff, Hanover
County,
                    *Defendants.*

GAYLE W. FIGG, personally and as
personal representative of the estate
of Thomas Allen Figg, deceased;
ROBERT L. FIGG, III; JOHN STUART
FIGG; MARTHA FIGG WILLIAMS;
WAYNE ATTANASIO,
                    *Plaintiffs-Appellants,*

v.

JOHN A. SCHROEDER, Sergeant;
MICHAEL J. ANTHONY, Sergeant;
THOMAS C. LAND, Individually and
in his official capacity as Sheriff's
Deputy; JOHN DOES, 1-10, consisting
of several unidentified Hanover
County Sheriff's Deputies,
individually and in their official
capacities as Sheriff's Deputies;
WINSTON R. ROBERTSON; DOUGLAS R.
HINES; V. STUART COOK,
Individually and as Sheriff, Hanover
County,
                    *Defendants-Appellees.*

No. 01-2443

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-00-698-3)

Argued: September 24, 2002

Decided: December 3, 2002

Before WILLIAMS, MOTZ, and KING, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Williams and Judge Motz joined.

---

## COUNSEL

**ARGUED:** Robert A. Dybing, SHUFORD, RUBIN & GIBNEY, Richmond, Virginia, for Appellants. James Mason Loots, GOLD-STEIN LOOTS, P.C., Washington, D.C., for Appellees. **ON BRIEF:** John A. Gibney, Jr., SHUFORD, RUBIN & GIBNEY, Richmond, Virginia; Yvonne S. Wellford, OFFICE OF THE COUNTY ATTOR-NEY, Hanover, Virginia, for Appellants.

---

## OPINION

KING, Circuit Judge:

This appeal stems from a series of events surrounding the shooting death of Thomas Figg on January 7, 2000, in Hanover County, Virginia. Shortly before midnight on that evening, Deputy Sheriff Thomas C. Land pursued a pickup truck on suspicion of drunken driving. The truck, driven by Thomas Figg, eventually pulled over at the driveway of the Figg family farm, near Ashland, Virginia. What began as a routine traffic stop soon escalated into a struggle, during which Deputy Land shot and fatally wounded Thomas Figg. Three of Thomas Figg's siblings (Robert Figg, Martha Figg Williams, and John Figg) and a family friend (Wayne Attanasio) arrived on the scene; all four were then detained and held until about 2:30 a.m. on January 8, 2000, while the Hanover County Sheriff's Department investigated the incident.

The four detainees, together with the personal representative of the deceased Thomas Figg, initiated this lawsuit in the Eastern District of Virginia. They sued various members of the Sheriff's Department, alleging violations of state and federal law.[1] Of relevance here, the

---

[1]The six original defendants were Deputy Thomas C. Land, Sheriff V. Stuart Cook, Captain Douglas R. Hines, Captain Winston R. Robertson, and the Appellants, Sergeants John A. Schroeder and Michael J. Anthony. All claims against Captain Hines were withdrawn before trial.

district court awarded qualified immunity to all of the defendants on the federal claims stemming from the initial portions of the detentions, but refused to award immunity to them with respect to the later portions of the detentions. After a jury trial in September 2001, the court entered judgments against Defendants John A. Schroeder and Michael J. Anthony with respect to the detentions of Plaintiffs Martha Figg Williams and John Figg.

Defendants Schroeder and Anthony have appealed and the Plaintiffs have cross-appealed. We possess jurisdiction pursuant to 28 U.S.C. § 1291. As explained below, we affirm in part, reverse in part, vacate in part, and remand.

I.

The parties are largely in agreement on the material facts underlying this case. Those facts are set out below, with notations indicating relevant points of dispute.

A.   *The Stop*

Shortly before midnight on the chilly night of January 7, 2000, Deputy Land attempted to stop Thomas Figg on suspicion of driving under the influence of alcohol. Deputy Land turned on the blue light of his patrol car, but Mr. Figg continued on, turning into the driveway of Round Top Farm, the Figg family residence in Hanover County. Deputy Land followed and chirped his siren, and Thomas Figg stopped. As Deputy Land walked to the truck, he smelled alcohol on Mr. Figg; he also saw two unknown men approaching down the farm's dark driveway, carrying a flashlight.[2]

---

[2]Round Top Farm was known to members of the Sheriff's Department as the home of the Figg family, and the family had a reputation for domestic violence, hard drinking, fighting, and possession of firearms (including pistols, rifles, shotguns, and semi-automatic weapons). Of the three Figg brothers, Thomas Figg (the driver of the pickup truck) had twice been convicted of assault and battery of his wife; Robert Figg had been convicted of assaulting a law enforcement officer; and John Figg was a twice-convicted felon. Because of the Figgs' violent reputation, the Hanover County deputies had an unwritten policy of calling for backup support before responding to a call from the Figgs.

When the two approaching men (Robert Figg and Wayne Attanasio) were approximately forty feet away from him, Deputy Land asked them what they were doing; one (Robert Figg) responded only by asking Deputy Land what he was doing with his brother. Deputy Land directed the men to leave, but Robert Figg said he owned the land and that he was not going anywhere. Deputy Land then ordered the men to hold out their arms so that he could determine whether they had weapons; both complied, but they still refused to leave.

Thomas Figg then suddenly got out of his truck. Deputy Land interpreted this act as a threat and radioed for backup support. Sergeant Michael Anthony, as well as two other Hanover County deputies, headed for Round Top Farm. As they did so, numerous members of the County Sheriff's Department, recognizing the address, discussed via radio the Figgs' reputation for fighting and drunkenness.

After leaving his truck, Thomas Figg refused to permit Deputy Land to perform field sobriety tests on him, but he offered his hands to be handcuffed. Deputy Land, not wanting to turn his back on Robert Figg and Wayne Attanasio, ordered Thomas Figg to his knees. Thomas Figg refused, however, and Deputy Land promptly informed him that he was under arrest. Thomas Figg began to walk away, but then turned suddenly toward Deputy Land; Deputy Land sprayed him with pepper spray and Thomas Figg ran into the woods. Deputy Land radioed that he was in foot pursuit, and eleven officers, including Sergeant Schroeder, responded. Deputy Land pursued and caught up to Thomas Figg. The two struggled, and Deputy Land shot Thomas Figg three times, fatally wounding him.

Robert Figg, standing nearby, heard the shots. He yelled to Deputy Land, "Motherfucker, I'm going to kill you," and then ran to the Figg house and called 911. In his 911 call, Robert Figg made additional threats and used profanity, and he requested that someone come and restrain Deputy Land. When other officers began to arrive on the scene, Deputy Land told them only that shots had been fired; they did not know that Land was the only shooter.

### B. *The Initial Detentions*

Still on the scene, Wayne Attanasio was immediately handcuffed and placed on the ground by Deputy Land. When a car suddenly

appeared, heading down the driveway from the Figg house, Deputy Land placed Mr. Attanasio in a patrol car with another deputy. Deputies testified that Mr. Attanasio was loud and obnoxious, smelled of alcohol, and seemed to be drunk; he concedes that he had had several drinks that night.

The approaching car was driven by Martha Figg Williams, who had been awakened by her brother Robert Figg's 911 call. Barefoot and in nightclothes, she drove the quarter-mile from the Figg house to where Thomas Figg's pickup truck was parked on the farm road. When Ms. Williams arrived on the scene, a deputy ordered her to stay in her car, but she disobeyed, and she got out of her car yelling and cursing. Ms. Williams was ordered to return to her car, but she refused. Sergeant Anthony then placed her face-front against the car and attempted to handcuff her. Ms. Williams struggled, but she was handcuffed.

Immediately after Ms. Williams had been handcuffed, Robert Figg approached the deputies on foot, returning from the Figg house after making his 911 call. The deputies testified that he was yelling; and Sergeant Anthony heard Robert Figg say that "he could get his AK-47 and kill us all." Robert Figg, by contrast, testified that he was walking with his hands outstretched to show he was unarmed, calling out that he had no gun. The officers took cover and drew their weapons. At Sergeant Anthony's direction, Robert Figg was frisked and handcuffed. The officers testified that Robert Figg cursed, yelled, and threatened them, and there was evidence that he attempted to incite Mr. Attanasio to fight the deputies. Again disputing this account, Robert Figg claims that he was merely begging the deputies to help his brother Tom, and that instead of going to his brother's aid, the deputies ordered him to lie on the freezing ground. It is undisputed that Robert Figg had been drinking.

Just after Robert Figg was handcuffed, a pickup truck sped down the road from the direction of the Figg house. The deputies took cover again and barricaded the road with a police car. The truck stopped and the driver, John Figg, was apprehended, obviously upset and apparently quite drunk. Sergeant Anthony recognized John Figg, having previously arrested him for a felony. At Sergeant Anthony's direction,

John Figg was searched, handcuffed, and placed in a patrol car. It is undisputed that he was, by this point, cooperative.

## C.   *The Later Detentions*

Sergeant Schroeder gave a deputy permission to place Ms. Williams in a patrol car because she was cold. He then instructed a deputy to take her to the Figg house, because she was unarmed and had calmed down, and because she had children at the house who were unattended. Sergeant Schroeder had seen what appeared to be a bonfire nearby and, thinking that it was a party and that there might be others around, directed the deputy to stay with Ms. Williams at the Figg house. Sergeant Schroeder knew that there were weapons in the house, and he was concerned that other members of the family, or their friends, might arrive armed at the scene of the shooting. Two deputies stayed at the Figg house until 2:30 or 3:00 a.m., about two and a half hours. During this period, Ms. Williams was not permitted to leave the house or to make phone calls. It is undisputed, though, that the deputies there were polite and circumspect.

Wayne Attanasio, Robert Figg, and John Figg were kept in custody at the scene of the shooting until after 2:30 a.m. After being placed in a patrol car, Mr. Attanasio cursed at the officers and banged his head against the window for approximately thirty minutes. Mr. Attanasio explained at trial that he had been trying to get attention so that someone would see to Tom (and, later, to get someone to let him out to urinate). Though questioned during his detention about the shooting of his friend Thomas Figg, Mr. Attanasio refused to answer.

Robert Figg, still handcuffed, was also eventually placed in a patrol car. He allegedly told one deputy that he had a lot of guns and was thinking of coming back to shoot the officers; officers smelled alcohol on his breath. John Figg was kept handcuffed for an hour or more, then was held uncuffed for another forty-five minutes. Though apparently extremely intoxicated, he was cooperative throughout.

At about 2:30 a.m., Sheriff V. Stuart Cook directed the release of the three men (Robert Figg, Wayne Attanasio, and John Figg). Several of the deputies objected to the release, fearing that one or more of the three would return armed to the shooting scene. After Robert

Figg assured Sheriff Cook that he would not return to the scene if released, all three were freed. The officers who had remained with Ms. Williams at the Figg house left the house at approximately the same time. Deputies remained at the scene of the shooting until dawn on January 8, 2000.

## II.

On October 26, 2000, Robert Figg, Wayne Attanasio, Martha Figg Williams, and John Figg, along with the personal representative of Thomas Figg, initiated this lawsuit in the Eastern District of Virginia, alleging numerous violations of state and federal law stemming from the events surrounding Thomas Figg's death. The original defendants, sued both individually and in their official capacities, were Deputy Land, Sheriff Cook, Captain Douglas R. Hines, Captain Winston R. Robertson, and the Appellants here, Sergeants Schroeder and Anthony.[3] All claims against Captain Hines were withdrawn before trial. Of the remaining counts, those relevant to this appeal are set forth below, as are their respective dispositions.

## A.

Robert Figg, Wayne Attanasio, Martha Figg Williams, and John Figg (collectively, the "Figgs") brought claims under § 1983 against Sergeants Schroeder and Anthony (the "Sergeants") and other officers, in their individual capacities, alleging that the Figgs' detentions on the night of Thomas Figg's shooting constituted illegal seizures. The court granted qualified immunity to the Sergeants and other officers as to the initial portions of those detentions, and it accordingly awarded them summary judgment on the corresponding aspects of the Figgs' § 1983 claims.[4] The court denied qualified immunity to the

---

[3]In its original complaint, the Plaintiffs also named ten "John Doe" defendants. However, the Plaintiffs subsequently amended their complaint, omitting the allegations against the John Doe defendants.

[4]In its analysis of the Sergeants' assertions of qualified immunity on the federal unlawful seizure claims, the court distinguished between the earlier and later portions of the Figgs' confinements. It awarded immunity to the Sergeants as to those portions of the detentions that occurred

Sergeants and other officers as to the later parts of the detentions, and it allowed those aspects of the Figgs' § 1983 claims against the Sergeants to go to the jury.[5]

In addition to the federal claims, the Figgs also brought state-law claims against the Sergeants, alleging that the Figgs' detentions constituted false imprisonment. The court denied in full the Sergeants' motions for summary judgment and allowed the state-law claims to go to the jury.

After an eight-day trial, conducted in September 2001, the jury disposed of the Figgs' claims against the Sergeants in three distinct ways. First, the jury found against Robert Figg both on his illegal seizure claims and on his false imprisonment claims. Second, the jury found in favor of Ms. Williams and John Figg both on their illegal seizure claims and on their false imprisonment claims. Third, the jury found against Wayne Attanasio on his illegal seizure claims, but it failed to render a verdict on his false imprisonment claims.

After the jury was discharged and the omission of a verdict on Mr. Attanasio's false imprisonment claims against the Sergeants was discovered, Mr. Attanasio moved for a new trial on those claims. Extrapolating from the jury's verdict in favor of the Sergeants on Mr. Attanasio's illegal seizure claims, the court concluded that the Sergeants were necessarily entitled to prevail on the state-law false imprisonment claims as well. *Figg v. Cook*, No. 3:00-CV-698, Mem.

---

prior to the officers' removal of Ms. Williams to the Figg house (approximately half an hour after the Figgs were first detained). *Figg v. Cook*, No. 3:00-CV-698, Mem. Op. at 7 (E.D. Va. Sept. 4, 2001). For ease of exposition, we refer to the confinements during this early period as the "initial detentions." The court denied immunity to the Sergeants on the federal claims arising from the portions of the detentions following Ms. Williams's removal from the scene. *Id.* Again for ease of exposition, we refer to the Figgs' confinements during this later period as "the later detentions."

[5]By contrast, the Figgs' § 1983 claims against the other officers as to the later parts of the detentions never made it to the jury. The disposition of those claims is discussed fully at note 6, *infra*.

Op. at 5 (E.D. Va. Oct. 30, 2001) (the "Opinion"). Furthermore, it reasoned that Mr. Attanasio had waived his objection to the omitted verdict by failing to raise the objection prior to the jury's discharge. Accordingly, the court denied Mr. Attanasio's motion for a new trial on his false imprisonment claims. *Figg v. Cook*, No. 3:00-CV-698, Order at 1 (E.D. Va. Oct. 30, 2001). Mr. Attanasio has appealed.

The jury awarded Ms. Williams and John Figg $12,000 and $2,000, respectively, against the Sergeants; the court subsequently added to that amount an attorney's fee award of $55,567.76. The Sergeants have appealed those verdicts and awards. The Figgs have cross-appealed, asserting that the court erred in granting the Sergeants and other officers qualified immunity from the portion of the § 1983 claims pertaining to the initial detentions.[6]

### B.

In addition to the numerous claims stemming from the Figgs' detentions, Thomas Figg's personal representative brought both a § 1983 excessive force claim and a state-law wrongful death claim against Deputy Land based on the shooting of Thomas Figg. At trial, the court instructed the jury that, if it found Deputy Land's fatal wounding of Thomas Figg to be reasonable, then it must render a verdict for Deputy Land on both the § 1983 claim and the state-law wrongful death claim. The court overruled the objection to this instruction raised by Thomas Figg's personal representative, and the jury found in favor of Deputy Land on both counts. Thomas Figg's personal representative has appealed.

---

[6]The Figgs brought federal and state claims stemming from their detentions not only against the Sergeants, but against two other officers as well — Sheriff Cook and Captain Robertson. Like the Sergeants, Cook and Robertson were awarded qualified immunity with respect to the initial detentions. Unlike the Sergeants, Cook and Robertson prevailed at trial on motions for judgment as a matter of law, both on the federal seizure claims as to the later detentions and on the state-law false imprisonment claims. Bench Rulings, Sept. 12-13, 2001. As a result, none of the claims against Cook and Robertson were submitted to the jury. Sheriff Cook and Captain Robertson are parties only to the Figgs' cross-appeal challenging the court's award of qualified immunity with respect to the initial detentions.

### III.

We begin by addressing the issues raised on appeal by Sergeants Schroeder and Anthony. The Sergeants first assert that the district court erred in deciding that they are not entitled to qualified immunity on the federal civil rights claims of Ms. Williams and John Figg arising from the later detentions; and that they are not entitled to state-law immunity on the state-law false imprisonment claims of those Plaintiffs for the same period. Accordingly, the Sergeants contend that the court wrongly denied their respective Rule 50 motions for judgment as a matter of law. We agree and reverse.

We review de novo the denial of a motion for judgment as a matter of law. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir.), *cert. denied*, 122 S. Ct. 342 (2001). A court may grant such a motion only "if, viewing the evidence in the light most favorable to the non-moving party and drawing every legitimate inference in that party's favor," it determines that "the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 656-57 (4th Cir. 1996) (internal quotation omitted).

### A.

Our qualified immunity inquiry proceeds in two distinct steps. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, a court reviewing a denial of a Rule 50(b) motion after a jury verdict must ask whether, taken in the light most favorable to the party asserting the injury, "the evidence adduced at trial is sufficient to establish that [the officers] committed a constitutional violation . . . ." *Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001). If the answer is "no" then the analysis ends; the plaintiff cannot prevail. *See Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002).

If the answer to that first question is "yes," however, then the next step is to ask whether the constitutional right was clearly established in the "'specific context of the case' — that is, [whether] it was 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)); *see also Wilson*, 536

U.S. at 615; *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987). This second step of the qualified immunity inquiry is an objective one, dependent not on the subjective beliefs of the particular officers at the scene, but instead on what a hypothetical, reasonable officer would have understood under those circumstances. *Milstead v. Kibler*, 243 F.3d 157, 161 (4th Cir.), *cert. denied*, 122 S. Ct. 199 (2001). It ensures that, when the legality of a particular course of action is open to reasonable dispute, an officer will not be subjected to trial and liability. Under the doctrine of qualified immunity, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

### B.

We turn, then, to the first step of our qualified immunity inquiry: is the evidence adduced at trial, viewed in the light most favorable to Ms. Williams and John Figg, sufficient to show that the Sergeants' conduct violated a constitutional right? Answering "no," we rule in favor of the Sergeants; we need not reach the second step of the immunity analysis.

### 1.

The parties do not dispute that Ms. Williams' and John Figg's Fourth Amendment rights were implicated by their treatment on the night of January 7, 2000. Though neither was subject to formal arrest, both were nonetheless "seized." An individual has been seized "if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("In the absence of formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable man in the suspect's position would have understood his situation." (internal quotation omitted)); *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (noting that test for determining whether there has been informal arrest is whether suspect's freedom of action has been curtailed to degree associated with formal arrest). Since it is undisputed that John Figg would not have been allowed to leave the patrol car in

which he was detained, and since it is likewise undisputed that the deputies at the Figg house would permit Ms. Williams neither to leave nor to place phone calls, both were subjected to Fourth Amendment seizure.

2.

The question becomes, then, whether either Ms. Williams or John Figg has proffered evidence that, if credited, would lead to the conclusion that either of their seizures violated the Constitution. As explained below, they have not.

The Fourth Amendment prohibits only unreasonable searches and seizures. What constitutes a reasonable seizure "depends on all of the circumstances surrounding the . . . seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). As a general rule, after initial questioning, any further detention or search is reasonable for Fourth Amendment purposes only if it is "based on consent or [on] probable cause [for arrest]." *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975). An officer has probable cause for arrest if the facts known to him at the time would warrant the belief of a prudent person that the arrestee had committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Under what we will refer to as the minor offense doctrine, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. Lago Vista*, 532 U.S. 318, 333 (2001) (finding no constitutional violation in jailing of seat-belt law violator). Viewing the evidence in the light most favorable to Ms. Williams and John Figg, and drawing every legitimate inference in their favor, the only conclusion that a reasonable trier of fact could draw is that the Sergeants had probable cause to believe that both Ms. Williams and John Figg had committed minor offenses in the officers' presence. Accordingly, under the minor offense doctrine, the seizures of Ms. Williams and John Figg were reasonable under the Fourth Amendment.

Ms. Williams does not contest the officers' testimony that she disobeyed an order to remain in or to return to her automobile when she

first arrived at the shooting scene, shortly before midnight on January 7, 2000. As a result, it is undisputed that the officers at the scene had probable cause to believe that Ms. Williams had violated Virginia's obstruction of justice statute, and thus that she could lawfully be placed under arrest.[7] *Cf. Chicago v. Morales*, 527 U.S. 41, 69 (1999) (Kennedy, J., concurring in part) (describing protection of crime scene as legitimate basis for police command, which can subject citizen to prosecution). Similarly, it is undisputed that John Figg had been drinking on the evening of January 7, 2000, that just past midnight he drove to the shooting scene, and that he appeared drunk to the officers present. Even when the facts are viewed in the light most favorable to John Figg, the Sergeants had probable cause to believe that he had violated Virginia's DUI law.[8]

Because the Sergeants had probable cause to arrest and jail both Ms. Williams and John Figg, the Sergeants did not violate the Fourth Amendment by detaining both Ms. Williams and John Figg for a few hours. Thus, our qualified immunity inquiry ends there. The Sergeants cannot be held liable under federal law for the seizures; their entitlement to qualified immunity should have been recognized and their motion for judgment as a matter of law should have been granted.

## C.

With respect to the appeal of the Sergeants, we must now determine whether they were similarly entitled to judgment as a matter of

---

[7]The Virginia obstruction of justice statute provides that: "[i]f any person . . . knowingly obstructs a . . . law-enforcement officer . . . or fails or refuses without just cause to cease such obstruction when requested to do so . . . he shall be guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-460.A. And under Virginia law, a police officer is authorized to "arrest, without a warrant, any person who commits any crime in the presence of the officer." *Id.* § 19.2-81.

[8]The Virginia DUI statute provides that: "[i]t shall be unlawful for any person to drive or operate any motor vehicle . . . while such person is under the influence of alcohol." Va. Code Ann. § 18.2-266; *see also Gray v. Commonwealth*, 477 S.E.2d 301, 302 (Va. App. 1996) (holding that Virginia's DUI statute does not require that operation of motor vehicle occur on public road).

law with respect to the state-law false imprisonment claims. As explained below, we conclude that they were.

In Virginia, the tort of false imprisonment requires "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Jordan v. Shands*, 500 S.E.2d 215, 218 (Va. 1998). We need not analyze the Virginia law of immunity in order to conclude that the evidence adduced at trial, even when taken in the light most favorable to Ms. Williams and John Figg, shows that their detentions do not constitute false imprisonment in Virginia. A Virginia police officer "has the duty to arrest a person who commits a misdemeanor in his presence, even though the officer has no arrest warrant . . . . And an arrest, though warrantless, is valid where the officer had probable cause to believe that a misdemeanor was committed in his presence." *Yeatts v. Minton*, 177 S.E.2d 646, 648 (Va. 1973). As discussed above, the undisputed facts are that the Sergeants had probable cause to arrest both Ms. Williams and John Figg. Consequently, the Plaintiffs have adduced no evidence indicating that their detentions could have been "without legal justification"; to the contrary, each officer's conduct was consistent with his duty. The district court thus erred in denying judgment as a matter of law to the Sergeants on the false imprisonment claims.[9]

---

[9]Our decision that the Sergeants were entitled to judgment as a matter of law on both the federal civil rights claims and the state-law false imprisonment claims, because they had probable cause to believe that both Plaintiffs committed minor offenses, renders it unnecessary for us to consider the array of additional issues raised by the Sergeants on appeal, to wit: whether the court erred in denying Sergeant Schroeder's Rule 50 motion for judgment as a matter of law as to both Plaintiffs due to a lack of evidence connecting him to their detentions; whether the court erred in denying Sergeant Anthony's Rule 50 motion for judgment as a matter of law as to Ms. Williams due to a lack of evidence connecting him to her detention; whether the court erred in refusing to dismiss all claims brought by John Figg in light of a dearth of evidence; whether the court erred in upholding John Figg's damage award; and whether the court erred in denying the Sergeants' motions to reduce the verdicts as duplicative.

IV.

We turn now to the three contentions raised on cross-appeal by the Plaintiffs: (1) that the award of qualified immunity to several of the Defendants with respect to the federal claims arising from the initial detentions of Robert Figg, Mr. Attanasio, Ms. Williams, and John Figg was inappropriate; (2) that the jury instruction on the wrongful death claim stemming from the shooting of Thomas Figg constitutes reversible error; and (3) that Mr. Attanasio's motion for a new trial on his state-law false imprisonment claims against the Sergeants should have been granted. We address each of these contentions in turn.

A.

Robert Figg, Wayne Attanasio, Ms. Williams, and John Figg (collectively, the "Figgs") assert in their cross-appeal that the district court erred in awarding qualified immunity to Sheriff Cook, Captain Robertson, Sergeant Schroeder, and Sergeant Anthony (collectively, the "Officers") with respect to the federal claims arising from the initial detentions (that is, the detentions for the approximate half-hour period prior to the deputies' discovery of weapons in the Figgs' house). The Figgs maintain that, as a result of this ruling, the court wrongly awarded partial summary judgment to the Officers on the federal claims stemming from those detentions. Furthermore, the Figgs contend, the jury instruction on the Officers' immunity unfairly prejudiced the jury's evaluation of the claims made by Robert Figg and Mr. Attanasio on the later detentions. We disagree, and we affirm the district court's award of qualified immunity.

1.

We review de novo a district court's award of summary judgment. *Taylor v. McDuffie*, 155 F.3d 479, 482 (4th Cir. 1998) (reviewing award of summary judgment made on qualified immunity grounds). Only when there is no genuine issue as to any material fact is summary judgment appropriate. *Id.* In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *Id.*

We conclude, under the two-step *Wilson* qualified immunity analysis, *see supra* at 12, that summary judgment was appropriate as to all Plaintiffs. With respect to Ms. Williams and John Figg, the propriety of their longer detentions under the minor offense doctrine justifies, a fortiori, their initial detentions as well. *See supra*, Part III. And with respect to all of the Figgs, even when all possible inferences are drawn in their favor, the Officers' conduct was justified by exigent circumstances and violated no constitutional right. Consequently, the Officers were entitled to summary judgment on qualified immunity grounds with respect to all of the initial detentions, and the court did not err in so ruling.

2.

The exigent circumstances exception to the warrant requirement "basically encompasses officer safety and the destruction of easily-disposed evidence." *Gould v. Davis*, 165 F.3d 265, 270-71 (4th Cir. 1998). For police officers successfully to assert the exigent circumstances doctrine, they need only possess a "reasonable suspicion" that such circumstances exist at the time of the search or seizure in question. *United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998). And, as usual, courts should not engage in "unreasonable second-guessing" of the officers' assessment of the circumstances that they faced. *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985).

Exigent circumstances render permissible a warrantless search or seizure, even when there is no probable cause to believe that a crime has been committed. *See, e.g.*, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (burning building is exigent circumstance that allows fire-fighters to enter without a warrant). One such circumstance exists when police officers engaged in lawful investigatory functions would be endangered in the absence of a warrantless seizure. *See Michigan v. Summers*, 452 U.S. 692, 702-03 & n.17 (1981) (holding that officers may temporarily detain civilians present at scene of lawful investigation, when such detention is reasonably necessary to secure officers' safety);[10] *see also United States v. Kurchi*, 892 F. Supp. 775,

---

[10]In fact, in *Summers* the Court went even further, suggesting that officers are entitled to detain even when "no special danger . . . is suggested by the evidence in th[e] record," and the only apparent danger to the officers is the danger inherent in the fact of their unwanted presence. *Summers*, 452 U.S. at 702.

786 (W.D. Va. 1995) (listing, among factors relevant in determining exigency, "the possibility of danger to police guarding [a] site"); *cf. Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967) (holding that danger to life of police officers constituted exigency justifying warrantless search); *State v. Green*, 575 A.2d 1308, 1313 (N.H. 1990) (holding that police must be permitted to regulate the movements of civilians at crime scene, and that they need not have articulable suspicion of crime to stop individual who is approaching).

3.

It is undisputed that the Officers addressed a series of unexpected and potentially dangerous encounters in the period immediately following their arrival at Round Top Farm on the night of January 7-8, 2000. When they reached the scene, they knew only that there had been a shooting; and even after speaking with Deputy Land, they did not know that he was the only person to have discharged a firearm. The Officers were at the home of a family whose reputation for violence and possession of assault weapons was well-known to many members of the police force. Their presence was strongly objectionable to the Figgs, who were understandably angry and distraught that Thomas Figg had been shot. *Cf. Summers*, 452 U.S. at 702-03 (observing that even ordinary search may prompt violent response). Faced with the need to conduct their investigation of the shooting incident in a reasonably safe environment, the initial, half-hour detentions of the Figgs constituted a measured and proportionate response.

Because the Officers' arrival at Round Top Farm would prompt a reasonable officer to believe the situation to be dangerous, we conclude that those exigent circumstances justified the initial, half-hour, warrantless detentions of the Figgs. Accordingly, the district court was correct to accord the Officers summary judgment on the federal claims for the initial detentions, on the basis of qualified immunity.[11]

---

[11]Because the Figgs failed to object to the jury instruction regarding the Officers' immunity for the initial detentions, they have waived their entitlement to our review of the instruction. *See* Fed. R. Civ. P. 51 (party may not assign error to jury instruction unless he objects before jury retires); *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 453 (4th Cir. 1990). In any event, because the initial detentions were lawful, the instruction to that effect thus was proper.

B.

The Plaintiffs next maintain, in their cross-appeal, that the court erred in instructing the jury that, if it found Deputy Land's fatal wounding of Thomas Figg to be reasonable, then it must render a verdict for Deputy Land on both the § 1983 claim and the state-law wrongful death claim. We review de novo a trial court's instruction to a jury, *Superior Form Builders, Inc. v. Chase Taxidermy Supply Co.*, 74 F.3d 488, 495 (4th Cir. 1996), keeping in mind that a court has "considerable discretion in choosing the specific wording of instructions." *United States v. Piche*, 981 F.2d 706, 712 (4th Cir. 1992). A judgment may be reversed for error in an instruction "only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Abraham v. County of Greenville*, 237 F.3d 386, 393 (4th Cir. 2001).

The Figgs correctly observe that, while the excessiveness of force is a prima facie element of their § 1983 action, *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989), they need only prove, to prevail in their state wrongful death action, that Thomas Figg's death was the fault of the Defendants; any justification must then be raised as an affirmative defense to the state claim, *McGee v. Commonwealth*, 248 S.E.2d 808, 810 (Va. 1978). The Figgs maintain that, because a plaintiff must satisfy a heavier burden to prevail on a § 1983 action, the court misled the jury when it instructed that a finding against them on the federal claim required a like finding on the state-law counterpart. *See Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 147 (3d Cir. 1984).

Despite this distinction between the § 1983 and state-law burdens of proof, the jury instruction was not erroneous. As the Figgs concede, the court correctly instructed the jury on the differing burdens of proof for the constitutional and state-law claims. Their objection is to what came next. After properly instructing the jury on the burdens of proof for the constitutional and state-law claims, the court went on to explain to the jury:

> You can say yes or no as to whether or not there was no excessive force, that is necessarily a finding that the officer was reasonable in shooting Tom Figg. And if you found that

he was reasonable in shooting him in the course of his duties, that is not a wrongful death.

This latter aspect of the instruction, though potentially misleading, does not constitute error for two reasons. First, it does not misstate the applicable law. Rather, it properly informs the jury that, should it conclude that Deputy Land acted reasonably, it should render a verdict in Land's favor on both the federal excessive force and the state-law wrongful death claims. Though a defendant has the burden of proving reasonableness on such a wrongful death claim, it is true under both federal and state law that, once the jury found that Deputy Land acted reasonably, he was entitled to prevail. Second, even if we were to adopt the Figgs' reading of the instruction and conclude that it obscures the distinction between the federal and state burdens of proof, it still would not be erroneous: the instructions as a whole, containing a correct statement of the applicable burdens of proof, properly informed the jury of the controlling legal principles. *See Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987).

## C.

Finally, Plaintiff Wayne Attanasio asserts that the court erred in denying his motion for a new trial on his state-law false imprisonment claims against the Sergeants. We review for abuse of discretion a district court's denial of a motion for new trial or amendment of judgment under Fed. R. Civ. P. 59. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 500 (4th Cir. 2001); *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994). We will not reverse such a decision "save in the most exceptional circumstances." *Bristol Steel*, 41 F.3d at 186 (quoting *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 168 (4th Cir. 1985)).

## 1.

The error on which Mr. Attanasio premised his motion for a new trial was the jury's failure to address his state-law false imprisonment claims against Sergeants Schroeder and Anthony. Though the verdict was read into the record on September 19, 2001, prior to the discharge of the jury, neither the court nor counsel noticed that the jury had not answered the four questions addressing — and had thereby not ren-

dered a verdict on — Mr. Attanasio's false imprisonment claims. This oversight is less surprising than it might first appear: Mr. Attanasio's state-law claims against the Sergeants were only two of the twenty-two claims submitted to the jury; and the entire verdict was read aloud in open court just before the jury was discharged. However, having neglected to notice the omission, Mr. Attanasio failed to bring it to the court's attention in a timely manner; he instead raised his objection only after the jury had been discharged. As a result, the court missed the opportunity to correct the problem by resubmitting the unaddressed questions to the jury.

On belatedly learning that the jury had left blank a portion of its verdict form, the court undertook to supply the missing findings by deduction. It noted, in ruling on the motion for a new trial on October 30, 2001, that the jury had rendered a proper verdict in favor of the Sergeants on Mr. Attanasio's federal detention claims. Concluding that "a finding for Mr. Attanasio on the false imprisonment claim would conflict directly with the jury's finding against him on the federal detention claim," the court deduced that the Sergeants were entitled to prevail on the state claims as well. Opinion at 5. It accordingly denied the motion for a new trial.

A court is obliged to harmonize inconsistencies in a jury's responses on a special verdict form, if it is possible to do so. *Talkington v. Atria Reclamelucifers*, 152 F.3d 254, 261 (4th Cir. 1998) (citing *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)); *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir. 1985). "If, however, 'viewed in the most generous way, the answers are inconsistent with each other, a new trial is ordinarily required.'" *Ladnier*, 769 F.2d at 198 (quoting 9 Wright & Miller, *Federal Practice and Procedure* § 2510 (1971)).

Here, even if we import the harmonization principle from the context of inconsistent special verdicts to this situation — an omitted general verdict[12] — the court's effort at harmonization would fail. As

---

[12]A "special verdict" is a verdict "that gives a written finding for each issue, leaving the application of the law to the judge." *Black's Law Dictionary* (7th ed. 1999). A "general verdict," by contrast, is a verdict "by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions." *Id.* The verdict at issue in this case is a general verdict.

Mr. Attanasio correctly observes, the burdens of proof for the § 1983 and state law claims are not the same. A plaintiff bears a heavier burden on a § 1983 claim, for which he must prove the illegality of the seizure. By contrast, in order to prevail on his false imprisonment claim, a Virginia plaintiff need only prove that he was detained; it is for the defendant to proffer an adequate legal justification warranting the detention. *See W.T. Grant Co. v. Owens*, 141 S.E. 860, 865 (Va. 1928) ("Prima facie, any restraint put by fear or force upon the actions of another is unlawful, and constitutes false imprisonment unless a showing of justification makes it a true or legal imprisonment." (citation omitted)); *Montgomery Ward & Co. v. Wickline*, 50 S.E.2d 387, 388 (Va. App. 1948). Thus, this jury could have found against Mr. Attanasio on his § 1983 claim, and yet nevertheless have rendered a verdict in his favor on the state-law false imprisonment claims to which it failed to respond. Hence, the court erred in concluding that a verdict for Mr. Attanasio on the false imprisonment claims would "conflict directly" with the verdict in favor of the Sergeants on the § 1983 claims, and thus that it could supply the missing verdict.[13]

2.

We turn next to the court's second ground for denying Mr. Attanasio's motion for a new trial: waiver. Citing the Second Circuit for the proposition that "[a] party waives an objection to a defective or inconsistent verdict if such objection is not timely made," *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992), the court con-

---

[13]In supplying the missing verdict and entering judgment against Mr. Attanasio on his false imprisonment claims, the court also noted that the jury had rendered its verdict against Robert Figg, and that "Mr. Attanasio's claims were based on virtually the same factual scenario as those of Robert Figg." Opinion at 5. This inference is not appropriate: the verdict against Robert Figg did not preclude the possibility that the jury could have found in favor of Mr. Attanasio. There were differences in the evidence pertaining to Robert Figg and Mr. Attanasio. Significantly, while the Sheriff's Department had had prior encounters with Robert Figg, there was no evidence that Mr. Attanasio was known to any of the officers on the scene. *Cf. Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 677 (7th Cir. 1985) ("Each plaintiff is entitled to have his case decided separately, on a preponderance-of-the evidence standard that itself recognizes the inevitable uncertainties in evidence.").

cluded that even were it impossible to supply the missing verdict, "the doctrine of waiver would bar Mr. Attanasio's efforts to secure a new trial." Opinion at 5. We disagree.

In *Lavoie*, the jury had rendered a special verdict pursuant to Fed. R. Civ. P. 49(a); on appeal, the losing party challenged the verdict as internally inconsistent. The Second Circuit held that when an appellant fails to challenge an inconsistent special verdict prior to the jury's discharge, any objection is waived. *Lavoie*, 975 F.2d at 54. Applying this rule, the court below concluded that Mr. Attanasio had waived his objection to the lack of a verdict on his false imprisonment claims. While the *Lavoie* approach is a plausible one, our precedents require us to take a different path. *See Ladnier v. Murray*, 769 F.2d 195 (4th Cir. 1985).

In our *Ladnier* decision, a jury had rendered a special verdict pursuant to Fed. R. Civ. P. 49(a); and though neither party raised any objection at trial, the losing side challenged the verdict on grounds of inconsistency in its appeal. *Id.* at 198. Contrary to the *Lavoie* rule relied on by the court below, we held in *Ladnier* that the failure of a party to move to resubmit conflicting special findings to the jury for reconciliation does not constitute waiver of the objection. *Id.* at 198 n.3.[14] In so ruling, Chief Judge Winter explained that "the legal error resulting from entry of a judgment based on inconsistent special interrogatories may be an error of constitutional magnitude, infringing the seventh amendment right to jury trial 'by allowing the District Court to usurp the jury's function.'" *Id.* (quoting *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 948 n.1 (5th Cir. 1982)). Accordingly, we vacated the judgment and remanded for a new trial. *See also Carter v. Rogers*, 805 F.2d 1153 (4th Cir. 1986).

---

[14]Though we announced this approach to waiver in a footnote, it nonetheless carries precedential effect as part of our *Ladnier* holding because it is a "determination of a matter of law pivotal to [our] decision" in that case. *Black's Law Dictionary* (7th ed. 1999). The parties in *Ladnier* failed to bring the verdict's inconsistency to the court's attention prior to the jury's discharge. Had we not concluded in note 3 that this lapse did *not* waive the parties' right to challenge the verdict on the basis of that inconsistency, we could not have gone on as we did to entertain and grant the aggrieved party's request for a new trial.

Our *Ladnier* reasoning applies with even greater force in this situation. Here, the objection raised is to a general verdict, rather than to a special verdict; and the problem identified is not the verdict's inconsistency, but rather its nonexistence. These distinctions can only heighten our concern that the error is of constitutional magnitude. The court's entry of a judgment against a plaintiff, despite the jury's failure to render any verdict whatsoever, deprives the plaintiff of his right to a jury's resolution of his civil claim. *Cf. Johnson v. Tsukahara*, 448 P.2d 822 (Haw. 1968) (awarding new trial where jury returned verdict for one plaintiff but with respect to second plaintiff returned blank form, despite no objection having been raised at trial); *Roadruck v. Schultz*, 77 N.E.2d 874 (Ill. App. 1948) (same). Because *Ladnier* is not distinguishable on these facts, we are bound to recognize and follow it. We are unable, under *Ladnier*, to recognize a waiver premised on failure to object to an inconsistent verdict prior to the jury's discharge. Applying that precedent here, we must conclude that Mr. Attanasio has not waived his objection to the jury's failure to render any verdict at all.

3.

Because a verdict on this unresolved question cannot be inferred from the jury's other findings, and because waiver is inapplicable in these circumstances,[15] we must assess the merits of Mr. Attanasio's

---

[15]The Sergeants also suggest that we should affirm the court's denial of Mr. Attanasio's motion for a new trial because they are immune from liability on the false imprisonment claim, and thus that count should never have gone to the jury. The Sergeants, however, confuse federal qualified immunity ("an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), with the doctrine of state-law immunity that is relevant here. Under Virginia law, while it is a defense to unlawful imprisonment for an officer to allege and prove a good faith and reasonable belief in the validity of an arrest, *De Chene v. Smallwood*, 311 S.E.2d 749, 751 (Va. 1984), a plaintiff nonetheless remains entitled to a jury determination of those issues, *cf. Wellington v. Daniels*, 717 F.2d 932, 937 n.7 (4th Cir. 1983) (reviewing jury instructions on the good faith defense); *Parker v. McCoy*, 188 S.E.2d 222, 226 (Va. 1972) (same). Because Virginia's "good faith" immunity does not spare a Virginia official the burden of a jury trial, we reject the Sergeants' suggestion that we uphold the judgment against Mr. Attanasio on immunity grounds.

motion for a new trial. We find instructive the approach taken by the Court of Appeals for the Seventh Circuit, when it grappled with a similar problem in *Adams Laboratories, Inc. v. Jacobs Engineering Co., Inc.*, 761 F.2d 1218 (7th Cir. 1985). In *Adams*, the jury returned a verdict for the plaintiff on a negligence claim, but it failed to render a verdict on claims of negligent misrepresentation and breach of contract. Despite this omission, the court entered judgment in favor of the plaintiff on all three counts. Though, unlike here, the *Adams* court noticed the omission and polled the jury in an attempt to clarify the verdict before entering judgment, the Seventh Circuit concluded that the trial court's questioning left matters ambiguous. As a result, "the district court denied [the defendant] its right to trial by jury on the breach of contract and negligent misrepresentation claims when it entered judgment against [the defendant] on these issues." *Id.* at 1221; *see also Johnson*, 448 P.2d at 822 (holding that, where jury returned verdict for one plaintiff but with respect to second plaintiff returned blank form, trial court was not entitled to supply missing verdict, and awarding new trial); *Roadruck*, 77 N.E.2d at 874 (same).

Our situation is much like that found in *Adams*: the court entered judgment against Mr. Attanasio in an attempt to resolve the omissions of the verdicts in a manner that would reflect the true intent of the jury. However, because a verdict for the Sergeants on the false imprisonment claims cannot be inferred from the jury's decision on the federal seizure counts, the court's entry of judgment against Mr. Attanasio on the false imprisonment claims results in the denial of his right to trial by jury. As a result, the court should have granted him a new trial. We vacate its denial of that relief, and we remand Mr. Attanasio's false imprisonment claims against the Sergeants for a new trial.

V.

The sole remaining issue in these appeals relates to the attorney's fee award against the Sergeants. As a result of our disposition of the Sergeants' appeal, as set forth in Part III, *supra*, Ms. Williams and John Figg are no longer prevailing parties for purposes of a fee award under 42 U.S.C. § 1988. And when parties who prevailed at trial lose on appeal, they cease to be entitled to attorney's fees under § 1988. *See Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 175 (4th

Cir.), *cert. denied*, 121 S. Ct. 1188 (2000). Accordingly, we also vacate the district court's attorney's fee award.

## VI.

Pursuant to the foregoing, we affirm in part, reverse in part, vacate in part, and remand for such other proceedings as may be appropriate.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*